NOT RECOMMENDED FOR PUBLICATION
File Name: 08a0288n.06
Filed: May 22, 2008

NO. 07-1681

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT


MICHIGAN SUGAR CO.,

      Plaintiff-Appellee,

v.                                   ON APPEAL FROM THE
                                          UNITED STATES DISTRICT
BAKERY, CONFECTIONERY,          COURT FOR THE EASTERN
TOBACCO WORKERS, AND            DISTRICT OF MICHIGAN
GRAIN MILLERS INTERNATIONAL
UNION, LOCALS 259-G, 260-G, 261-G,
262-G,

      Defendants-Appellants.
_____/

BEFORE:    GUY, SUHRHEINRICH, and COLE, Circuit Judges.

      **SUHRHEINRICH, Circuit Judge.**  Plaintiff-Appellee, Michigan Sugar Co. ("Michigan Sugar"), filed a complaint challenging an arbitration award in favor of Defendants-Appellants Bakery, Confectionery, Tobacco Workers, and Grain Millers International Union ("BCTGM") Locals 259-G, 260-G, 261-G, and 262-G (collectively "the Michigan Locals"). The district court granted summary judgment for Michigan Sugar, and vacated the arbitrator's award. We find that the arbitrator was "arguably construing" the collective bargaining agreement at issue. Accordingly, we **REVERSE** the district court's decision and **REMAND** the case to the district court with instructions to reinstate the arbitrator's award.

I.

      Michigan Sugar, a corporation that produces and sells sugar, maintains four worksites in

Michigan, and two in Ohio. Employees in all six worksites are represented by individual local affiliates of the BCTGM. The Michigan Locals (Locals 259-G, 260-G, 261-G, and 262-G), are together a party to a single collective bargaining agreement ("CBA") with Michigan Sugar. The employees at the Ohio worksites are part of a single local union affiliate, Local 294-G, and are party to a separate collective bargaining agreement with Michigan Sugar.

In the May of 2004, the collective bargaining agreement between Michigan Sugar and the Ohio Local 294-G expired, and those parties began negotiation of a new collective bargaining agreement. In August of 2004, the Ohio Local 294-G began an economic strike after the negotiations faltered.

On August 5, 2004, Michigan Sugar sent a letter to "all bargaining unit employees" at the four Michigan worksites, ostensibly "to provide [the employees] with a brief status of the negotiations between the Michigan Sugar Company's Ohio facilities and your union." The letter stated:

> It is the company's understanding that the [BCTGM] Union has authorized a strike at both Ohio [worksites]. We also believe that the union has authorized Michigan employees to refuse to cross any picket lines that the Ohio employees may establish at our Michigan facilities. We sincerely hope that neither of these actions occur, as the company strongly believes that Ohio employees do not have the right to picket the Michigan facilities. Furthermore, and more importantly to you, any refusal by Michigan employees to come to work as a result of such picket line, would have serious consequences if it is found to be in violation of the union's and company's no-strike agreement.

The letter also stated that "[a]n employee's refusal to perform work under these circumstances could result in the immediate *loss of all un-accrued benefits, including health care*." (emphasis in original).

Beginning on August 7, 2004, the Ohio Local 294-G established picket lines at the Michigan worksites. Some of the employees at the Michigan worksites declined to cross the picket lines on

the days when the Ohio Local 294-G picket lines were present at the Michigan worksites. Michigan employees who observed the picket lines were denied health insurance coverage by Michigan Sugar on those days in which they declined to work. Michigan Sugar sent letters to employees who refused to cross the picket lines, advising them of the discontinuation of their health care benefits, and advised them of their right to continued coverage under the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA").

The Michigan Locals took the position that Michigan Sugar's denial of health insurance to employees who observed the picket lines violated the CBA, specifically Article 3, § 9. Article 3, § 9 stated that Michigan Sugar would not require its employees, under penalty of discharge or discipline of any kind, to walk through or cross picket lines established at the worksite by "other labor organizations."

In August of 2004, the Michigan Locals filed a grievance protesting Michigan Sugar's actions, and filed an unfair labor practice charge with the NLRB. The Michigan Locals alleged that Michigan Sugar violated § 8(a)(1) of the National Labor Relations Act by sending the August 5, 2004 letter to employees threatening them with loss of health benefits if they declined to cross the Ohio Local 294-G's picket line. The charge also alleged that Michigan Sugar violated § 8(a)(1) and 8(a)(3) of the Act by actually discontinuing health insurance coverage and denying accrued benefits to employees who refused to cross the picket lines. On October 6, 2004, the NLRB administratively deferred the charge to arbitration.[1] On April 4, 2005, the parties agreed to arbitration, and mutually

_____

[1]Michigan Sugar also filed a charge with the NLRB against the Michigan Locals, alleging that the Michigan Locals engaged in a secondary strike in violation of § 8(b)(4) of the Act. Michigan Sugar characterized participating employees' act of refusing to cross picket lines as an illegal secondary strike. Michigan Sugar withdrew the charge one week later.

selected Arbitrator Mario Chiesa ("the Arbitrator") to hear the grievance and unfair labor practice charge.

On October 28, 2005, the Arbitrator issued his opinion and award. The Arbitrator found that Michigan Sugar violated the terms of the CBA and the National Labor Relations Act when it discontinued coverage for employees who observed the picket lines.

On January 11, 2006, Michigan Sugar filed suit in federal court to vacate the arbitration award. On October 20, 2006, the magistrate judge issued a report and recommendation recommending summary judgment in favor of the Michigan Locals. Michigan Sugar then filed an objection to the report and recommendation.

On January 26, 2007, the district court issued an order rejecting the report and recommendation, and granting summary judgment for Michigan Sugar. The district court found that the Arbitrator erred in applying Article 14, § 4(B), governing the termination of insurance for terminated employees. The district court found that because the employees at issue "were not terminated," the Arbitrator's decision "was based on a provision . . . that clearly has no application in this situation," and thus failed to "draw its essence from the bargaining agreement."

The Michigan Locals filed a motion for reconsideration, arguing that the arbitration award should be upheld under *Mich. Family Res., Inc. v. Serv. Employees Int'l Union Local 517M*, 475 F.3d 746 (6th Cir. 2007) (en banc), *cert. denied*, 127 S.Ct. 2996 (2007), which changed this Circuit's standard for reviewing arbitration awards. The district court denied the motion, finding that the more

---

Michigan Sugar filed a lawsuit against the Michigan Locals in federal court, seeking a temporary restraining order that would compel Michigan employees to cross the picket lines and report to work as scheduled. The district court denied Michigan Sugar's request, and the lawsuit was dismissed on March 1, 2005.

recent "case law articulates the same standard" that the district court used in granting summary judgment for Michigan Sugar. The district court acknowledged that it must uphold the arbitration award if the Arbitrator "was arguably construing or applying the contract," but found that the Arbitrator "arguably construed *something*, just not the collective bargaining agreement." (emphasis in original.)

## II.

While we review a district court's grant of summary judgment de novo, our review of arbitration awards is "very limited." *Mich. Family Res.*, 475 F.3d at 752. In *Michigan Family Resources*, this Court, sitting en banc, overruled our previous standard for reviewing arbitration awards. Under the new standard, we consider three questions to determine whether "procedural aberration" justifies overturning an arbitrator's award. First, "[d]id the arbitrator act 'outside his authority' by resolving a dispute not committed to arbitration?" *Id*. at 753. Second, "[d]id the arbitrator commit fraud, have a conflict of interest or otherwise act dishonestly in issuing the award?" *Id*. And third, "in resolving any legal or factual disputes in the case, was the arbitrator 'arguably construing or applying the contract'?" *Id*. "So long as the arbitrator does not offend any of these requirements, the request for judicial intervention should be resisted even though the arbitrator made 'serious,' 'improvident' or 'silly' errors in resolving the merits of the dispute." *Id*. We hold "serious arbitral error[s]" binding on a party to arbitration, "because serious errors are a risk inherent in arbitration." *Peterbilt Motors Co. v. UAW Intern. Union*, 219 Fed. App'x 434, 438 (6th Cir. 2007).

The parties agree that we need only consider the third question: whether the Arbitrator was "arguably construing or applying the contract." In *Michigan Family Resources*, we explained that

we will find that the arbitrator was "arguably construing the contract" so long as "the arbitrator appeared to be engaged in interpretation" of the contract. *Mich. Family Res.*, 475 F.3d at 753. The Court held that if there is doubt that an arbitrator "appeared to be engaged in interpretation," "we will presume that the arbitrator was doing just that." But we acknowledged that:

> we cannot ignore the specter that an arbitration decision could be so 'ignorant' of the contract's 'plain language,' as to make implausible any contention that the arbitrator was construing the contract. An interpretation of a contract thus could be so untethered to the terms of the agreement . . . that it would cast doubt on whether the arbitrator indeed was engaged in interpretation.

*Id*. at 753 (internal citations and alterations omitted).

In applying its newly-fashioned standard to uphold the arbitration award at issue in *Michigan Family Resources,* this Court found that the arbitrator in that case "appeared to be engaged in interpretation," observing that:

> [t]he arbitrator's ten-page opinion has all the hallmarks of interpretation. He refers to, quotes from and analyzes the pertinent provisions of the agreement, and at no point does he say anything indicating that he was doing anything other than trying to reach a good-faith interpretation of the contract.

*Mich. Family Res.*, 475 F.3d at 754.

Under the deferential Michigan Family resources standard, we conclude that the arbitration award must be upheld in this case because the Arbitrator "appeared to be engaged in interpretation." The Arbitrator's opinion "has all the hallmarks of interpretation," because, like the arbitrator in *Michigan Family Resources*, the arbitrator quoted from and analyzed the pertinent provisions of the CBA.

The Arbitrator considered Article 13 of the CBA, which prohibits strikes and lockouts, providing:

During the term of the Agreement there shall be no cessation of work by employees who are covered by provisions of this Agreement or action of any form taken or permitted by impairing [Michigan Sugar]'s operations or affecting the distribution of any of its products, except as stated in Article 3, Section 10, nor shall there be any lockout by [Michigan Sugar].

The Arbitrator noted that Article 13 allowed an exception to its prohibition on strikes with its reference to Article 3, § 10, which provides that "employees have the right to strike if [Michigan Sugar] refuses to abide by the decision of an arbitrator." The Arbitrator then found that Article 13, based on its "clear language," prohibits sympathy strikes, and determined that "individuals who engage in work cessation in violation of [Article 13] have violated the [CBA], and, as a result, are subject to the disciplinary considerations in the [CBA]."

The Arbitrator then discussed Article 14, § 4, which governs the "termination of insurance," providing:

Section 4. Termination of Insurance.

(A) Layoff. In the event a regular employee is laid off for longer than a six (6) month period [Michigan Sugar]'s responsibility to assume their cost of the above benefit shall cease; however, this does not prevent the employee from continuing to pay for this insurance through the group plan.

(B) Termination of Employment. In the event of termination of employment other than normal layoff or retirement with pension, an employee's hospitalization, surgical and medical coverage and life insurance under the group arrangement shall be cancelled in thirty (30) days, unless continued under Subsection c. of Section 2, above.

The Arbitrator found that Article 14, § 4(B), pertaining to "termination of employment," applied to the dispute, and that the term "termination of employment" can "be interpreted . . . to mean that employees who are not working, but yet have some relationship with [Michigan Sugar] will not have their coverage cancelled until 30 days have passed." The arbitrator also noted that no other

provisions of the CBA dealt with the termination of insurance, and concluded that Article 14, § 4(B) "expresses the mutual intent of the parties that employees will have a minimum of 30 days paid health insurance under any circumstances that could arguably fall within the definition of termination of employment." The Arbitrator also noted that "[t]he grievants are still employees even though they have honored the picket lines," but are "entitled to health insurance coverage" because of Article 4, § 4(B).

The Arbitrator then discussed Article 3, § 9, which enumerates three instances in which employees are accorded certain protections based on the activities of "other labor organizations":

> (A) Picket Lines – Other Premises. [Michigan Sugar] agrees that its employees will not be required under penalty of discharge or discipline of any kind to walk through or cross in any manner any picket line maintained by a labor organization, and any refusal to cross a picket line singly or in concert shall not constitute a breach of this contract.

> (B) Picket Lines – [Michigan Sugar] Premises. [Michigan Sugar] further agrees that in the event of any picket line by any labor organization placed around the front of any entrance to its premises, it will not require its employees under penalty of discharge or discipline of any kind to walk through or cross said picket line in any manner, and any refusal to cross a picket line singly or in concert shall not constitute a breach of this contract.

> (C) Remedies for Breach. It is further agreed that in the event of any violation of these provisions by the Company, an individual employee affected by such violation shall have the right to maintain an action at law or equity in the courts to redress any injuries suffered thereby, in addition to any other provisions in this Agreement for redress of grievance.

The Arbitrator found that Article 3, § 9 "protects employees from the application of the no-strike language [of Article 13] if the failure to cross a picket line is considered a strike." Because Article 3, § 9 accords protection based on the activities of "other labor organizations," the Arbitrator considered whether the Ohio Local 294-G was a separate labor organization from the Michigan

Local. The Arbitrator found that the Ohio Local 294-G was an "other labor organization[]" for purposes of applying Article 3, § 9, despite the fact that the locals were "combined into one union for the purpose of negotiating and enforcing the [CBA]." The Arbitrator concluded that Article 3, § 9 applied to the dispute.

Given its determination that Article 3, § 9 applied, the Arbitrator then assessed whether the cessation of health benefits constituted employer-imposed "discipline," prohibited under Article 3, § 9 for employees observing the picket lines. The Arbitrator decided that although the term "discipline of any kind" under Article 3, § 9 suggests a broad meaning, Michigan Sugar's refusal to pay the employees who refused to cross the picket lines was not discipline. The Arbitrator noted that the cancellation of health care benefits, however, is "extremely coercive" and a "violation of the [CBA]," as previously indicated in his discussion of insurance for employees terminated from employment under Article 14, § 4(B).

Michigan Sugar objects to the Arbitrator's analysis principally because the Arbitrator's decision rests upon its interpretation of Article 14, § 4(B), pertaining to "termination of employment." Michigan Sugar contends that the Arbitrator's finding that the employees at issue are "terminated" employees is a "bizarre" and "unsupported" finding, amounting to the Arbitrator dispensing "his brand of industrial justice."

The Arbitrator's interpretation of Article 14, § 4 in this case does not give a court grounds to vacate an arbitration award, even if the Arbitrator made a "bizarre" and "unsupported" finding, because we are directed to tolerate even "serious, improvident, or silly" legal or factual errors. *Mich. Family Res.*, 475 F.3d at 753. "It is the arbitrator's construction which was bargained for; and so far as the arbitrator's decision concerns construction of the contract, the courts have no business

-9-

overruling him because their interpretation of the contract is different from his." *United Steelworkers of Am. v. Enter. Wheel & Car Corp.*, 363 U.S. 593, 599 (1960). And we need not consider the merits of the contractual dispute at hand, because under *Michigan Family Resources*, "judicial consideration of the merits of a dispute is the rare exception, not the rule." *Mich. Family Res.*, 475 F.3d at 753.

It suffices to say that the Arbitrator was not wholly unjustified in basing his analysis on Article 14, § 4's provisions pertaining to "termination of insurance," including Article 14, § 4(B), which pertains to "termination of insurance" "[i]n the event of termination of employment." Article 14, § 4's provisions are the only ones that address the cessation of health care coverage for regular employees. In determining whether the employees at issue were entitled to health care coverage, Article 14, § 4 clearly had relevance to the dispute, even if the Arbitrator construed it incorrectly. This is not that rare instance in which an arbitrator's interpretation was so "untethered to the terms" of the CBA that it "cast[s] doubt" on whether he was engaged in interpretation. *Id*.

Most important for our purposes, the Arbitrator "appeared to be engaged in interpretation," given his quotation and interpretation of relevant portions of the CBA. *See id*. at 753 ("[ I]n most cases, it will suffice to enforce the award that the arbitrator appeared to be engaged in interpretation, and if there is doubt we will presume that the arbitrator was doing just that.") The Arbitrator quoted and analyzed Article 3, § 9, governing the "protection on the activities of other labor organization"; Article 13, § 1, governing the prohibition of strikes and lockout; Article 14, § 2, governing Hospital-Medical Surgical-Dental Benefits; and Article 14, § 4, governing the termination of insurance. Although "arbitrators in this area may be, and frequently are, non-lawyers (and therefore hardly inculcated in all of the nuances of contract interpretation)," and "have no obligation to issue a written

decision to justify their awards," *id*. at 755, the Arbitrator in this case is a licensed attorney, who, throughout his twenty-one page opinion, discussed and construed various provisions of the CBA. Because there is no indication that the Arbitrator "was doing anything other than trying to reach a good-faith interpretation of the contract," *id*., the district court erred in vacating the arbitration award.

## III.

For the reasons stated above, we **REVERSE** the district court's decision and **REMAND** the case to the district court with instructions to reinstate the arbitrator's award.