NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 07a0556n.06
Filed: August 8, 2007

Case No. 06-3304

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| DOMINIC A. VISCONSI, SR., *et al.,* | ) | |
| | ) | |
| Plaintiffs-Appellees, | ) | |
| | ) | **ON APPEAL FROM THE** |
| v. | ) | **UNITED STATES DISTRICT** |
| | ) | **COURT FOR THE NORTHERN** |
| LEHMAN BROTHERS, INC., *et al.,* | ) | **DISTRICT OF OHIO** |
| | ) | |
| Defendants-Appellants. | ) | |
| | ) | |
| _____ | ) | |

BEFORE: GUY, BATCHELDER, GILMAN, Circuit Judges.

ALICE M. BATCHELDER, Circuit Judge. Defendants-Appellants Lehman Brothers,

Inc. and Lehman Brothers Holdings, Inc. (collectively referred to as "Lehman") appeal the district

court's denial of their motion to vacate an arbitration award granting more than $10.4 million to

Plaintiffs-Appellees Dominic A. Visconsi, Sr., Dominic A. Visconsi, Jr., Anthoni Visconsi II, James

V. Stanton, and Peggy Stanton (collectively referred to as "Plaintiffs"). On appeal, Lehman argues

that we should vacate the arbitration award because it was issued in manifest disregard of the law.

Finding no merit in this argument, we **AFFIRM** the district court's decision.

**I.**

The arbitration award at issue in this case arose in the aftermath of a massive fraudulent

investment scheme orchestrated by Cleveland-based stockbroker, Frank D. Gruttadauria. During a

fifteen-year period, Gruttadauria misappropriated over $115 million from his clients and

misrepresented their account values by more than $280 million. He hid this extensive fraud by sending false account statements to his clients, which purported to summarize their respective investment portfolios, while diverting their true account statements to a post-office box in the name of a fictitious organization. When a client would request all or a portion of her investment funds, Gruttadauria would transfer money from one client to another — known as a third-party transfer — thus keeping his scheme afloat.

Gruttadauria began this scheme in the 1980s and continued it throughout the 1990s, while working for Cowen & Company, which later became SG Cowen Securities Corporation ("SG Cowen"). In October 2000, Lehman purchased SG Cowen's high-net-worth personal investment business and, as part of the deal, Gruttadauria agreed to work as a broker and branch manager in Lehman's Cleveland office. Gruttadauria continued his fraudulent scheme while working for Lehman, until January 2002, when he exposed his wrongdoing in a confession letter to the Federal Bureau of Investigation ("FBI"). He later pleaded guilty to securities fraud, mail fraud, identity theft, and making false statements to federally insured financial institutions.

In the aftermath of this widespread fraud, both the Securities and Exchange Commission ("SEC") and the New York Stock Exchange ("NYSE") investigated Lehman's oversight of Gruttadauria, and both determined that Lehman had violated their respective rules by failing reasonably to supervise Gruttadauria's activities. The SEC's and the NYSE's investigations uncovered many problems with Lehman's oversight: (1) Gruttadauria's dual role as branch manager and retail broker essentially enabled him to supervise himself; (2) Gruttadauria's unfettered access to the fax machine and postage meter allowed him to bypass Lehman's procedures for reviewing outgoing and incoming correspondence; and (3) Lehman lacked adequate procedures for monitoring

2

Gruttadauria's computer activity, his improper use of post-office box mailing addresses, and his unlawful use of third-party transfers.

Plaintiffs invested approximately $21 million with Gruttadauria during the time he was employed by SG Cowen, and rather than investing these funds as directed, Gruttadauria used Plaintiffs' money for his own purposes. Throughout this period, Plaintiffs made periodic withdrawals from their accounts amounting to $25.8 million, which Gruttadauria paid using funds from other clients. In spite of these substantial withdrawals, the last fictitious statements issued while Gruttadauria worked for SG Cowen indicated that Plaintiffs — collectively — had a total of $44.1 million in their accounts. In reality, however, Plaintiffs' accounts contained only $24,000. After Gruttadauria began working for Lehman, Plaintiffs withdrew an additional $5.5 million, deposited only $300,000, and watched their portfolio balances drop from $44.1 million to $37.9 million. In the end, despite the fact that their account statements showed millions of dollars in their investment accounts, Plaintiffs were actually left with only a few thousand dollars in those accounts.

In March 2002, Plaintiffs filed suit against Lehman, SG Cowen, and SG Cowen's predecessor, Societe Generale SA, alleging breach of fiduciary duty, breach of contract, promissory estoppel, fraud, conversion, civil conspiracy, aiding and abetting, negligent supervision, negligent misrepresentation, and statutory securities violations. In May 2002, Lehman filed a motion to stay the proceedings and compel arbitration, which the district court denied. In August 2003, we reversed the district court's decision, *see Fazio v. Lehman Bros., Inc.*, 340 F.3d 386, 398 (6th Cir. 2003), and on remand, the district court granted Lehman's motion to compel arbitration.

Plaintiffs then filed a statement of claim with a three-arbitrator panel provided by the National Association of Securities Dealers ("NASD"), reasserting the legal claims presented in their

3

federal court complaint, and requesting $37.5 million in compensatory damages and $300 million in punitive damages. The arbitration agreement stated that this dispute would be governed by New York state law. Prior to the hearing, Plaintiffs settled their claims against SG Cowen — the terms of which are confidential — and voluntarily withdrew their claims against Societe Generale SA.

The arbitration panel heard extensive evidence regarding Plaintiffs' claims against Lehman. Prior to issuing its decision, the panel requested and received briefing on Plaintiffs' argument that the arbitrators should hold Lehman liable for all the losses caused by Gruttadauria's fraud, including those incurred during his employment with SG Cowen. Plaintiffs argued that four legal theories supported their position: (1) Lehman could be held jointly and severally liable with SG Cowen and/or Gruttadauria because Lehman engaged in concerted action with both of them; (2) Lehman could be held jointly and severally liable with SG Cowen and/or Gruttadauria because Plaintiffs' injuries were indivisible and could not be apportioned among the tortfeasors; (3) Lehman was contractually liable for the entire amounts listed on Plaintiffs' fraudulent account statements; and (4) Lehman assumed responsibility for Gruttadauria's fraud because of its recklessness in hiring and supervising him. In response to Plaintiffs' brief, Lehman countered that (1) Plaintiffs had not established the requisite agreement needed to state a claim for civil conspiracy and (2) Plaintiffs' injuries were in fact divisible. In September 2005, the panel issued its decision without opinion, summarily awarding Plaintiffs more than $10.4 million in compensatory damages; one arbitrator dissented without explanation.

Unhappy with the panel's award — issued in the very forum it had fought so hard to get into — Lehman filed in the district court a motion to vacate the arbitration award, arguing that the award was issued in manifest disregard of the law. In February 2006, the district court denied this motion,

4

acknowledging that there was "sufficient support in the record and case law to support a conclusion that Lehman [was] jointly and severally liable," and stating that, in any event, "the arbitrators' award [could] be justified without reliance on joint and several liability." Lehman filed a timely notice of appeal.

## II.

"When reviewing a district court's decision to vacate or confirm an arbitration award, we review findings of fact for clear error and questions of law de novo." *Glennon v. Dean Witter Reynolds, Inc.*, 83 F.3d 132, 135 (6th Cir. 1996). Courts play a very limited role in reviewing the decision of an arbitrator. *See id.* at 136; *Mich. Family Res., Inc. v. Serv. Employees Int'l Union Local 517M*, 475 F.3d 746, 753 (6th Cir. 2007) (en banc) (emphasizing the narrow scope of judicial review over labor-arbitration decisions). When a party is challenging the merits of an arbitrator's decision, rather than the arbitral procedure, *see* 9 U.S.C. § 10(a), we will vacate only where the arbitrator "manifestly disregarded the law," *Dawahare v. Spencer*, 210 F.3d 666, 669 (6th Cir. 2000). "Our review for manifest disregard of the law does not open the door to extensive review of arbitral awards." *Id.* "A mere error in interpretation or application of the law is insufficient. Rather the decision must fly in the face of clearly established legal precedent." *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Jaros*, 70 F.3d 418, 421 (6th Cir. 1995) (citation omitted).

We will find a manifest disregard of the law only where "(1) the applicable legal principle is clearly defined and not subject to reasonable debate; and (2) the arbitrators refused to heed that legal principle." *Nationwide Mut. Ins. Co. v. Home Ins. Co.*, 330 F.3d 843, 847 (6th Cir. 2003) (quoting *Dawahare*, 210 F.3d at 669). As part of this two-prong showing, the challenging party generally must demonstrate that he or his opponent presented the allegedly disregarded legal

5

principle to the arbitrator. *See Dawahare*, 210 F.3d at 670 (rejecting a challenge to an arbitration award where the challenger "point[ed] to nothing in the record that show[ed] the arbitrators' awareness of the common law that he allege[d] to be applicable"); *Duferco Int'l Steel Trading v. T. Klaveness Shipping A/S*, 333 F.3d 383, 390 (2d Cir. 2003) ("In order to intentionally disregard the law, the arbitrator must have known of its existence, and its applicability to the problem before him.").

"Arbitrators are not required to explain their decisions. If they choose not to do so, it is *all but impossible* to determine whether they acted with manifest disregard [of] the law." *Dawahare*, 210 F.3d at 669 (emphasis added); *see also Jaros*, 70 F.3d at 421 ("Where, as here, the arbitrators decline to explain their resolution of certain questions of law, a party seeking to have the award set aside faces a tremendous obstacle."). In such situations, the alleged error of law often "cannot be shown with the requisite [degree of] certainty" because it is generally impossible, without engaging in unrestrained speculation, to "determin[e] what caused an arbitrator to rule as he did." *Elec. Data Sys. Corp. v. Donelson*, 473 F.3d 684, 691-92 (6th Cir. 2007). "If a court can find any line of argument that is legally plausible and supports the award[,] then it must be confirmed. Only where no judge or group of judges could conceivably come to the same determination as the arbitrator must the award be set aside." *Jaros*, 70 F.3d at 421.

The three-arbitrator panel in the present case did not issue an opinion supporting its award of $10.4 million. Plaintiffs asserted numerous bases upon which the arbitrators could have granted relief, including breach of fiduciary duty, breach of contract, promissory estoppel, fraud, civil conspiracy, aiding and abetting, negligent supervision, negligent misrepresentation, and statutory securities violations. Because we are not privy to the arbitrators' thought process, we are left to

6

guess at the precise legal basis upon which they awarded relief. Facing this sea of speculation, Lehman does not attempt to challenge each basis of liability, focusing instead on the broader issue of damages.

Lehman's arguments on the issue of damages are best divided into two groups: the first asserts that the arbitrators issued their award in manifest disregard of the law of joint and several liability; and the second contends that the arbitrators could not have based their award on any theory of individual liability (as opposed to joint and several liability). At the outset, we reiterate that Lehman faces a nearly impossible burden, created by the arbitrators' issuance of an award without an opinion.[1] *See Dawahare*, 210 F.3d at 669. If we determine that the arbitrators could have based their award on principles of joint and several liability, then the award must be upheld. *See Jaros*, 70 F.3d at 421. Furthermore, if we find that the arbitrators could have based their award on any theory of individual liability, then the award must be upheld for this alternative reason. *See id.*

We begin with Lehman's arguments regarding joint and several liability. Lehman primarily contends that it cannot be held jointly and severally liable for the harm caused by Gruttadauria or SG Cowen because Lehman itself did not cause *any* injury to Plaintiffs. Lehman did not present this argument to the arbitrators, and we generally will not find a manifest disregard of the law on the basis of a legal theory not presented at arbitration. *See Dawahare*, 210 F.3d at 670; *Duferco Int'l Steel*, 333 F.3d at 390. Moreover, Lehman cannot demonstrate a legal error with the "requisite certainty" needed to establish a manifest disregard of the law. *See Donelson*, 473 F.3d at 691-92.

---

[1] We pause to note that arbitrating parties are not unwittingly at the mercy of an unscrupulous arbitrator who attempts to insulate his decision by refusing to issue an opinion. We must remember that the arbitrator's role is created by contract, and the very contract that empowers the arbitrator to rule is the same contract that may demand a written opinion justifying his award. While Plaintiffs allege that NASD rules prohibited these arbitrators from issuing a written opinion, other arbitrating parties are free to contract for an arbitrator's opinion.

7

Lehman's argument is premised on its vehemently argued belief that it did not injure or damage Plaintiffs in any way, and this belief, in turn, is based on Lehman's out-of-pocket theory of calculating damages. Because the arbitrators did not issue an opinion, we cannot determine whether they adopted Lehman's theory of damages. Thus, any legal error premised on Lehman's belief that it did not damage Plaintiffs "cannot be shown with the requisite certainty" needed to establish a manifest disregard of the law. *See id*. at 692.

In any event, we find that the out-of-pocket theory of damages, which underlies Lehman's assertion that it did not harm Plaintiffs, is an improper means of determining damages under the circumstances, and thus Lehman's argument is wholly without merit. The out-of-pocket theory focuses on the direct cash flow to and from Plaintiffs; it is a reliance measure of damages, which seeks to return Plaintiffs to the position they held before investing their money with Gruttadauria, SG Cowen, and Lehman. Plaintiffs invested $21 million while Gruttadauria worked for SG Cowen, which was offset by their withdrawal of more than $21 million during that time. In contrast, Plaintiffs invested only $300,000 while Gruttadauria worked for Lehman, yet they withdrew more than $5.5 million during that time. Thus, Lehman contends that Plaintiffs actually *profited* from Gruttadauria's fraud during his employment with Lehman because, according to Lehman's theory, Plaintiffs gained more than $5.2 million during that period.

In contrast to Lehman's out-of-pocket theory, Plaintiffs urged the arbitrators to adopt the benefit-of-the-bargain measure of damages. The benefit-of-the-bargain theory focuses on the amount of money Plaintiffs would have received had Gruttadauria, SG Cowen, and Lehman invested Plaintiffs' funds as directed; it is an expectancy measure of damages, which seeks to put Plaintiffs in the position they would have held had Gruttadauria, SG Cowen, and Lehman not breached their

8

"bargain" to invest Plaintiffs' money. Plaintiffs' accounts allegedly contained $37.9 million at the time Gruttadauria exposed his fraud to the FBI. These fictitious figures purported to account for the more than $31.3 million Plaintiffs withdrew from their accounts over the years ($25.8 million while Gruttadauria worked for SG Cowen and $5.5 million while he worked for Lehman). Plaintiffs thus believe that, regardless of the amounts of their prior deposits and withdrawals, they are entitled to the entire $37.9 million that the spurious account statements represented as being contained in their accounts.

Lehman's out-of-pocket theory misapprehends the harm suffered by Plaintiffs and the facts of this case. Plaintiffs gave $21 million to Gruttadauria, not to hide under a rock or lock in a safe, but for the express purpose of investment, with a hope — indeed a reasonable expectation — that it would grow. Thus, the out-of-pocket theory, which seeks to restore to Plaintiffs only the $21 million they originally invested less their subsequent withdrawals, is a wholly inadequate measure of damages. Had Gruttadauria invested Plaintiffs' money as requested, their funds would have likely grown immensely, especially considering that Plaintiffs invested primarily throughout the mid-1990s, which, had they hired an honest broker or a watchful company that reasonably supervised its employees, would have placed their money in the stock market during one of the strongest bull markets in recent memory. In fact, the fictitious statements issued by Lehman, which were designed to track Plaintiffs' funds as if they had been properly invested, indicate that Plaintiffs' accounts would have grown to more than $37.9 million (even accounting for the withdrawal of more than $31.3 million). Plaintiffs thus could have reasonably believed that they were entitled to the full $37.9 million balance shown, regardless of the amounts of their previous deposits and withdrawals. We therefore reject Lehman's argument because it is founded on an improper — and wholly

9

inadequate — measure of damages.[2]

Lehman presents a barrage of other contentions to demonstrate how the arbitrators manifestly disregarded the law of joint and several liability, arguing that Lehman did not engage in concerted action with either Gruttadauria or SG Cowen, that Lehman did not provide substantial assistance to Gruttadauria or SG Cowen, and that Plaintiffs' injuries were easily apportioned among the tortfeasors. We need not address each of Lehman's individual arguments so long as we identify one legally plausible basis for the arbitrators' award. *See Jaros*, 70 F.3d at 421. Under New York law, a defendant may be held jointly and severally liable in at least three instances: (1) where the defendant acts in concert with another to produce a single injury; (2) where the defendant acts concurrently with another to produce a single injury; or (3) where the plaintiff's injury is "incapable of any reasonable or practicable division or allocation among multiple tort-feasors." *Ravo v. Rogatnick*, 514 N.E.2d 1104, 1106-07 (N.Y. 1987).

During the arbitration, Plaintiffs argued that their injuries could not be apportioned among Gruttadauria, SG Cowen, and Lehman, and urged the arbitrators to impose joint and several liability on that basis. In response, both before the arbitrators and on appeal, Lehman acknowledged that an indivisible injury caused by joint tortfeasors is a legally sufficient basis for imposing joint and several liability under New York law, *see id.* at 1107, but asserted that Plaintiffs' losses could be

---

[2]We similarly reject Lehman's argument that Plaintiffs actually *profited* during the period Lehman managed their funds. The only reason Lehman can pursue this argument is because Gruttadauria dissipated most of Plaintiffs' funds prior to leaving SG Cowen and joining Lehman, and thus needed to steal from other clients during this time. But the evidence presented to the arbitration panel was sufficient to demonstrate that Lehman was aware of significant irregularities in Gruttadauria's practices at the time of Lehman's purchase of this part of SG Cowen's business, and purchased it despite this knowledge.

easily apportioned between SG Cowen and Lehman.[3] We conclude that, contrary to Lehman's contentions, the arbitrators could have found Plaintiffs' injuries to be indivisible and therefore could have imposed joint and several liability on that basis. The arbitrators might reasonably have concluded that Plaintiffs' monetary losses — which derived from a tangled web of fraudulent transfers spanning more than a five-year period and involving two separate investment companies — were incapable of division among Gruttadauria, SG Cowen, and Lehman. This is particularly so in light of the evidence of Gruttadauria's improper activities that Lehman became aware of during its due diligence prior to its purchase of this part of SG Cowen's business. Even if we were to disagree with such a legal conclusion on the divisibility of Plaintiffs' injuries, a "mere error in interpretation or application of the law is insufficient" to establish a manifest disregard of the law. *See Jaros*, 70 F.3d at 421. Because there is a plausible legal basis for the arbitrators' award, we reject Lehman's argument that the arbitrators manifestly disregarded the law of joint and several liability.

Having concluded that the arbitrators could have based their award on principles of joint and several liability, we need not reach Lehman's arguments on individual liability. *See id.* We nevertheless acknowledge — as an alternative basis for the arbitration award — that the arbitrators might have held Lehman individually liable without resorting to principles of joint and several liability.[4] The arbitrators, for example, might have imposed individual liability under a theory of

---

[3]Lehman's argument fails to appreciate that Gruttadauria is also a joint tortfeasor and that we must consider the harm caused by his actions as well that caused by SG Cowen and Lehman.

[4]Because the arbitrators' award granted Plaintiffs $10.4 million, which is just a fraction of the $37.5 million requested by Plaintiffs, it is possible that the arbitrators found Lehman individually liable for the portion of damages it caused, rather than jointly and severally liable for Plaintiffs' entire damages. Perhaps the arbitrators calculated Plaintiffs' total damages to be $10.4 million and held Lehman jointly and severally liable for the entire amount; or perhaps the arbitrators calculated Plaintiffs' total damages to be $37.5 million and held Lehman individually liable

11

negligent supervision, *see Peter T. v. Children's Vill., Inc.*, 819 N.Y.S.2d 44, 47 (N.Y. App. Div. 2006) — a theory of liability which Plaintiffs presented to the arbitrators and which was supported by the SEC's and NYSE's findings that Lehman failed reasonably to supervise Gruttadauria. Lehman contends that the arbitrators could not have based their award on *any* theory of individual liability because Lehman did not damage Plaintiffs in any way. We have already considered and rejected, in the context of joint and several liability, Lehman's erroneous belief — premised on its out-of-pocket theory of damages — that it did not injure Plaintiffs. And for the same reasons that we rejected that argument in the context of joint and several liability, we also reject it in the context of individual liability.

In sum, we conclude that Lehman has not met its "all-but-impossible" burden of demonstrating that the arbitrators' award, unaccompanied by a legal opinion, was issued in manifest disregard of the law. *See Dawahare*, 210 F.3d at 669.

### III.

For the foregoing reasons, we **AFFIRM** the district court's order denying Lehman's motion to vacate the arbitrators' award.

---

only for the portion of damages caused by Lehman. We simply do not know.