RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 11a0262p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

TITAN TIRE CORPORATION OF BRYAN,

                 *Plaintiff-Appellant,*

      *v.*

UNITED STEELWORKERS OF AMERICA, LOCAL 890L,

                 *Defendant-Appellee.*

No. 09-4460

Appeal from the United States District Court
for the Northern District of Ohio at Toledo.
No. 08-02957—Jack Zouhary, District Judge.

Argued: April 27, 2011

Decided and Filed: September 9, 2011

Before: COLE and STRANCH, Circuit Judges; ZATKOFF, District Judge.[*]

_____

## COUNSEL

**ARGUED:** Heidi N. Eischen, EASTMAN & SMITH LTD., Toledo, Ohio, for Appellant. Daniel M. Kovalik, UNITED STEELWORKERS OF AMERICA, Pittsburgh, Pennsylvania, for Appellee. **ON BRIEF:** Thomas A. Dixon, Nicole A. Flynn, EASTMAN & SMITH LTD., Toledo, Ohio, for Appellant. Daniel M. Kovalik, Katharine Shaw, UNITED STEELWORKERS OF AMERICA, Pittsburgh, Pennsylvania, for Appellee.

_____

## OPINION

_____

      JANE B. STRANCH, Circuit Judge. Plaintiff-Appellant Titan Tire Corporation of Bryan appeals from the district court's summary judgment in favor of Defendant-

_____

[*] The Honorable Lawrence P. Zatkoff, United States District Judge for the Eastern District of Michigan, sitting by designation.

1

Appellee United Steelworkers of America, Local 890L. Titan challenges the district court's refusal to vacate a labor arbitration award finding that Titan lacked just cause to terminate Linda Tracy, a Titan employee and Union member. For the following reasons, we **AFFIRM** the judgment of the district court.

## I. BACKGROUND

On March 8, 2008, Linda Tracy injured her wrist as a result of an equipment malfunction while performing her job at Titan. She was sent to the hospital for treatment. While there, she was tested for drugs in accordance with the drug policy originally negotiated between the Union and Titan's predecessor, Continental General Tire, Inc., and later adopted by Titan in a letter of understanding attached to the parties' collective bargaining agreement ("CBA"). Tracy tested positive for marijuana use, and was subsequently terminated by Titan based exclusively on the positive test result.

The Union grieved the termination, arguing that it was excessive and unjust. The parties submitted the dispute to arbitration pursuant to the CBA. Before the arbitrator, the Union argued that there was no just cause for the termination because neither Titan nor Continental had provided its employees, including Tracy, advance notice of the drug policy and the consequences for testing positive, as was required under the policy. Titan, on the other hand, claimed that there was just cause for Tracy's termination given language in the drug policy stating that individuals who test positive are "subject to termination," which Titan interpreted as providing for automatic termination.

After conducting an evidentiary hearing, the arbitrator sustained the Union's grievance on October 16, 2008. The arbitrator concluded that Titan lacked just cause to terminate Tracy because Tracy—a nine-year and otherwise "satisfactory" employee—was not given adequate advance notice of the drug policy and the consequences for violating it as required by Section V of the policy. Although the arbitrator found Titan's interpretation of the "subject to termination" language in the drug policy to be "intellectually inviting," he ultimately rejected Titan's argument that "subject to termination" means automatic termination. His conclusion was partially

based on evidence that the pertinent language was a compromise between Continental and the Union. During negotiations, Continental apparently proposed the language "will be terminated," but Union negotiators successfully had it changed to "subject to termination," so that it would not provide for automatic termination. The arbitrator concluded that though Titan was unaware that "subject to termination" was a compromise, it still adopted bargaining intent when it accepted the existing drug program. Finding that Tracy's summary discharge did not adhere to just cause criteria, the arbitrator modified her termination to a ninety-day suspension and reinstated her to work with backpay. He also authorized Titan to subject Tracy to unannounced random drug testing for one year after her reinstatement.

On December 19, 2008, Titan filed this action in the Northern District of Ohio, asking the district court to vacate the arbitrator's award. The parties filed cross motions for summary judgment and the district court held a hearing on the matter. Titan's primary contention before the district court was that the arbitrator violated Article 19.04 of the CBA by relying on the negotiating history between Continental and the Union in construing the phrase "subject to termination." Among other things, Article 19.04 provides that Titan is not bound by any "oral representations with any previous employer regarding . . . the Agreements . . . or past practices . . . unless specifically adopted by [Titan] in writing." It also requires the Union to give Titan thirty days advance notice before introducing in an arbitration proceeding evidence of the negotiating parties' intent at the bargaining table.

On October 26, 2009, the district court granted the Union's motion and denied Titan's motion. Recognizing that a court must enforce an arbitration award if the arbitrator even arguably construed or applied the contract, the court affirmed the arbitrator's award because it was "indisputable that the arbitrator was construing and applying" the particular provisions of the CBA "relevant to the just cause standard, as well as the 'subject to termination' language that is the subject of the parties' dispute." Furthermore, the court concluded that even if citing the negotiating history between Continental and the Union was error, such error was harmless, because the language of

the CBA alone could justify the arbitrator's conclusion. According to the district court, the plain meaning of "subject to termination" indicates that permanent discharge is "an option" for employees who test positive for drugs, but it is not automatic. Titan filed this timely appeal.

## II. ANALYSIS

### A.    Standard of Review

"This Court reviews a district court's grant of summary judgment in a labor arbitration dispute *de novo*." *Totes Isotoner Corp. v. Int'l Chem. Workers Union Council/UFCW Local 664C*, 532 F.3d 405, 410 (6th Cir. 2008). "In a situation such as this, where we are reviewing *de novo* the district court's decision to [enforce or] vacate an arbitrator's award, the focus is on the arbitrator's analysis, not that of the district court." *Truck Drivers Local No. 164 v. Allied Waste Sys., Inc.*, 512 F.3d 211, 216 (6th Cir. 2008).

### B.    Limited Judicial Review of Labor-Arbitration Decisions

Federal labor arbitration case law is shaped largely by the strong congressional policy encouraging the resolution of labor disputes through arbitration procedures selected by the parties. Section 203(d) of the Labor Management Relations Act provides, "[f]inal adjustment by a method agreed upon by the parties is declared to be the desirable method for settlement of grievance disputes arising over the application or interpretation of an existing collective-bargaining agreement." 29 U.S.C. § 173(d). The seminal Supreme Court instruction on this national policy is found in the Steelworkers Trilogy,[1] three cases simultaneously decided in 1960. Their key lesson is that the

---

[1] *See United Steelworkers of Am. v. Enter. Wheel & Car Corp.*, 363 U.S. 593, 596–97 (1960) (federal courts are not to "review the merits of an arbitration award," but only determine whether the award "draws its essence from the collective bargaining agreement"); *United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582–83 (1960) (holding that "[a]n order to arbitrate [a] particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute"); *United Steelworkers of Am. v. Am. Mfg. Co.*, 363 U.S. 564, 568 (1960) (holding that the underlying "question of contract interpretation is for the arbitrator" and "[t]he courts . . . have no business weighing the merits of the grievance").

judiciary shall defer to the method selected by the parties to settle their differences, usually a grievance procedure culminating in final and binding arbitration.

Such judicial deference is grounded in the unique realities of workplace governance through collective bargaining agreements. While commercial contracts deem resort to courts or arbitration as a "breakdown in the working relationship of the parties,"

> the grievance machinery under a collective bargaining agreement is at the very heart of the system of industrial self-government. Arbitration is the means of solving the unforeseeable by molding a system of private law for all the problems which may arise and to provide for their solution in a way which will generally accord with the variant needs and desires of the parties.

*Warrior & Gulf Navigation Co.*, 363 U.S. at 581. Thus, arbitration is most commonly the final method agreed upon by the parties to settle workplace disagreements. Arbitration is the negotiated substitute for industrial strife. *See id.* at 578.

To achieve the twin goals of industry stabilization and industrial peace, *see id.* at 578–79, these negotiated systems of private law provide for implementation, not by judicial opinion, but by the decisions of a labor arbitrator knowledgeable in that industry. Such arbitrators commonly are not attorneys and the agreements they interpret and enforce are often the product of laymen. Their guiding principle is not contract law or, for that matter, any case law; it is the CBA and the common law of the shop. The practical reality is that the arbitrator "performs functions which are not normal to the courts" and "[t]he ablest judge cannot be expected to bring the same experience and competence to bear upon the determination of a grievance, because he cannot be similarly informed."[2] *Id.* at 581–82. Recognizing the unique nature of these systems of industrial self-government, Congress and the courts have enforced the bargain struck by

---

[2]Nor can the judiciary deliver the speedy resolution of disputes envisioned by the grievance procedure, particularly in light of the overwhelming number of grievances processed under CBAs.

the parties, they have entrusted the resolution of workplace disputes to arbitrators and have strictly circumscribed the role of the judiciary.

"[W]e afford great deference to the arbitrator's decision," *Equitable Res., Inc. v. United Steel, Paper & Forestry, Rubber, Mfg., Energy, Allied Indus. & Serv. Workers Int'l Union, AFL-CIO/CLC*, 621 F.3d 538, 545 (6th Cir. 2010), because the underlying "question of contract interpretation [is] for the arbitrator," *Am. Mfg. Co.*, 363 U.S. at 568. The parties bargained for the arbitrator's judgment and "all that it connotes" and "[t]he courts, therefore, have no business weighing the merits of the grievance, considering whether there is equity in a particular claim, or determining whether there is particular language in the written instrument which will support the claim." *Id.* (internal footnote omitted). "[I]f an arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, the fact that a court is convinced he committed serious error does not suffice to overturn his decision." *Major League Baseball Players Ass'n v. Garvey*, 532 U.S. 504, 509 (2001) (internal quotations marks omitted).

In *Michigan Family Resources, Inc. v. Service Employees International Union Local 517M*, 475 F.3d 746 (6th Cir. 2007) (*en banc*), we surveyed Supreme Court case law that reviewed labor-arbitration awards and articulated national labor policy. We concluded that our inquiry in such cases is confined to ascertaining whether there was a "procedural aberration" in the arbitration process. *Id.* at 753. In doing so, we ask three questions:

> [1] Did the arbitrator act outside his authority by resolving a dispute not committed to arbitration? [2] Did the arbitrator commit fraud, have a conflict of interest or otherwise act dishonestly in issuing the award? [3] And in resolving any legal or factual disputes in the case, was the arbitrator arguably construing or applying the contract?

*Id*. (internal quotation marks omitted). If the arbitrator "does not offend any of these requirements, the request for judicial intervention should be resisted even though the arbitrator made serious, improvident or silly errors in resolving the merits of the dispute." *Id.* (internal quotation marks omitted).

C.    **Arbitrator's Construction of the Titan-Union CBA**

Titan and the Union jointly submitted the just-cause question to the arbitrator pursuant to the CBA, and Titan does not allege that the arbitrator acted with fraud, a conflict of interest, or dishonesty in issuing his decision. Consequently, the first and second questions posed by *Michigan Family Resources* are not implicated in this appeal. The only issue is whether, in making the just-cause determination, the arbitrator arguably construed or applied the contract. *Id.* Titan primarily contends that the arbitrator did not do so because, in construing the "subject to termination" clause, he considered evidence of bargaining history in violation of Article 19.04 of the CBA.[3]

Titan's argument is foreclosed by this Court's *en banc* decision in *Michigan Family Resources*. At issue in *Michigan Family Resources* was an arbitrator's construction of ambiguous language contained in a collective bargaining agreement. In construing the language in favor of the union, the arbitrator considered evidence of past practices between the parties, despite a provision in the agreement prohibiting the use of such evidence to bind the parties. 475 F.3d at 749–50. This Court rejected the employer's challenge to the arbitrator's decision. We began by reiterating that the only question presented was whether the arbitrator even arguably construed or applied the contract in reaching its decision. *Id.* at 752 (internal quotation marks omitted). We recognized that "in most cases, it will suffice to enforce the award that the arbitrator *appeared* to be engaged in interpretation, and if there is doubt we will presume that the arbitrator was doing just that." *Id.* at 753 (emphasis added). There we concluded that the arbitrator's opinion had "all the hallmarks of interpretation" without any indication that the arbitrator was doing anything other than trying "to reach a good-faith interpretation of the contract." *Id.* at 754.

---

[3]We find no record of Titan presenting its Article 19.04 argument to the arbitrator. In fact, the arbitrator expressly found that Titan neither challenged nor refuted the bargaining-history evidence. Although arguments not presented to an arbitrator generally cannot be raised for the first time on review in federal court, *see, e.g.*, *Armco Employees Ind. Fed'n, Inc. v. AK Steel Corp.*, 149 F. App'x 347, 352 (6th Cir. 2005), we need not consider whether Titan adequately preserved its Article 19.04 argument because, even assuming it did, we are not persuaded by the merits of the argument.

This Court acknowledged, however, that "[a]n interpretation of a contract . . . could be so untethered to the terms of the agreement . . . that it would cast doubt on whether the arbitrator indeed was engaged in interpretation." *Id.* at 753 (internal quotation marks omitted). But we rejected the argument that the arbitrator's interpretative errors, including its reliance on evidence of past practices arguably in violation of the parties' CBA, satisfied this standard. The ambiguity in the contract "permitted, indeed required, the arbitrator to engage in construction of the agreement, which is all [the Court is] asked to determine." *Id.* at 755. "[W]e review outcomes, not opinions, while performing the exceedingly deferential task of considering whether to vacate an arbitration award." *Id.* The fact that the arbitrator may have chosen the "wrong path in justifying the award" does not give us a "warrant to vacate it." *Id.*

In the present case, the arbitrator interpreted the drug policy to require Titan to warn employees about discipline for positive drug tests. Section V of the policy specifically requires that employees be informed of the "[c]onsequences for . . . a positive controlled substances test." In light of Titan's failure to provide its employees such notice, the arbitrator concluded that Titan lacked just cause to terminate Tracy based entirely on her positive drug test. There is no indication in the arbitrator's twenty-four-page opinion reaching this conclusion that he "was doing anything other than trying to reach a good-faith interpretation of the contract." *Mich. Family Res.*, 475 F.3d at 754.

Moreover, it cannot be "said that the arbitrator's decision on the merits was so untethered from the agreement that it casts doubt on whether he was engaged in interpretation, as opposed to the implementation of his 'own brand of industrial justice.'" *Id.* (quoting *Enter. Wheel & Car Corp.*, 363 U.S. at 597). To establish the arbitrator's error, Titan relies on the "subject to termination" language contained in the drug policy, which it interprets as providing for automatic termination. The "subject to termination" language, however, is at best ambiguous, and its plain meaning actually cuts against Titan's argument—it indicates that an employee *might* be discharged for testing positive, but not automatically so. This language certainly does not demonstrate that the arbitrator

grossly deviated from the CBA and rendered his "own brand of industrial justice" in construing the provision in the Union's favor. *Id.*

Titan challenges the arbitrator's reliance on evidence of bargaining history between the Union and Continental in construing the "subject to termination" language. It contends that Article 19.04 of the CBA prohibited the arbitrator from relying on such evidence. It is questionable whether Article 19.04, which concerns oral representations and intent evidence, even applies to the exchange of proposed written contract provisions, the bargaining-history evidence relied upon by the arbitrator. But even assuming that it does, such an error would not establish that the arbitrator's decision "was so untethered from the agreement that it casts doubt on whether he was engaged in interpretation." *Mich. Family Res.*, 475 F.3d at 754. As explained above, the arbitrator made a good-faith attempt to interpret the just-cause and subject-to-termination provisions, and a reasonable construction of the pertinent language supports the arbitrator's interpretation.

As we held in *Michigan Family Resources*, the fact that the arbitrator may have erred by choosing "the wrong path in justifying the award . . . does not give us a warrant to vacate it." *Id.* at 755. The outcome reached by the arbitrator was based on his interpretation of the relevant contractual language, which is all we are asked to determine in conducting our "exceedingly deferential," *id.*, and "very limited," *Garvey*, 532 U.S. at 509, review of the arbitrator's decision.

## III. CONCLUSION

For the foregoing reasons, we **AFFIRM** the district court's grant of summary judgment for the Union.