RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 20a0046p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

ZEON CHEMICALS, L.P.,

　　　　　　　　　　　　*Plaintiff-Appellee*,

　　*v.*

UNITED FOOD AND COMMERCIAL WORKERS, LOCAL 72D,

　　　　　　　　　　　　*Defendant-Appellant*.

┐
│
│
│
├  No. 19-5703
│
│
│
┘

Appeal from the United States District Court
for the Western District of Kentucky at Louisville.
No. 3:18-cv-00376—Gregory N. Stivers, Chief District Judge.

Argued:  January 31, 2020

Decided and Filed:  February 13, 2020

Before:  SUTTON, BUSH, and READLER, Circuit Judges.

───────────────

## COUNSEL

**ARGUED:**  Michael J. Wall, BRANSTETTER, STRANCH & JENNINGS, PLLC, Nashville, Tennessee, for Appellant.  Catherine F. Burgett, FROST BROWN TODD LLC, Columbus, Ohio, for Appellee.  **ON BRIEF:**  Michael J. Wall, BRANSTETTER, STRANCH & JENNINGS, PLLC, Nashville, Tennessee, David O'Brien Suetholz, BRANSTETTER, STRANCH & JENNINGS, PLLC, Louisville, Kentucky, Pamela M. Newport, BRANSTETTER, STRANCH & JENNINGS, PLLC, Cincinnati, Ohio, for Appellant.  Catherine F. Burgett, FROST BROWN TODD LLC, Columbus, Ohio, Richard S. Cleary, FROST BROWN TODD LLC, Louisville, Kentucky, for Appellee.

---

**OPINION**

---

SUTTON, Circuit Judge.   Zeon Chemicals fired James Jenkins on the ground that he violated the company's attendance policy.  Consistent with the collective bargaining agreement, the local union took Jenkins' discharge to arbitration.  The arbitrator reinstated Jenkins.  Zeon challenged the award in federal court, and the district court vacated the award.  We reverse.

I.

Zeon Chemicals runs a synthetic components plant in Louisville, Kentucky.  Local 72D of the United Food and Commercial Workers Union represents some of the employees who work there.  Under the collective bargaining agreement, the company retained the right to "discharge and discipline" employees for "just cause."  R.1-2 at 7.  The parties agreed to arbitrate any grievances "not satisfactorily resolved" between the company and the union.  *Id.* at 17.

The agreement includes an attendance policy.  Each time an employee misses or reports late for a shift, he receives points.  Accruing six points in twelve months leads to a verbal warning, eight to a written warning.  At ten points, the company issues its final written warning and a one-day suspension.  For "employees with 20 years of service," the company may impose a thirty-day suspension as "a final step in the disciplinary process for employees" who reach the ten-point threshold.  *Id.* at 53.  Once a worker receives twelve points, that is "cause for termination."  *Id.*

James Jenkins worked at the plant for twenty-two years.  In 2017, while on a family vacation in Florida, his father asked him to retrieve a "grinder" from a neighbor.  R.18-2 at 40. As Jenkins tells it, he and the neighbor began arguing after Jenkins asked for the tool.  The neighbor eventually threw the grinder at Jenkins.  When Jenkins tried to pick it up, the neighbor hit Jenkins in the face.  To defend himself, Jenkins pulled out a "selfie stick" and hit the neighbor.  *Id.*  Retreating to his garage, the neighbor retrieved a crowbar and renewed his attack on Jenkins.  Outmetaled, Jenkins fled to his father's home.

Jenkins declined to press charges.   His neighbor did not extend the same courtesy. Jenkins pleaded guilty to felony battery, leading to a thirty-day sentence.

Before beginning his sentence, Jenkins met with his union representative and the company to find a way to keep his job.  The felony conviction was not Jenkins' only problem. He had already accrued eight and a half points under the attendance policy that year, and the thirty-day sentence would cross the twelve-point threshold.  Jenkins looked for ways to cover the days, but the company rejected each proposal.  The company refused to suspend him for thirty days, something his twenty-two years of service made him eligible for, because it did not want to send the message that employees could commit crimes without consequences.  And it declined to let him use vacation days for the time because other employees had already scheduled their days for the relevant weeks.  Jenkins reported to jail and lost his job.

Local 72D grieved his discharge, which led to arbitration.  The parties selected Stephen L. Hayford to arbitrate the dispute.  The arbitrator modified Jenkins' discharge to a thirty-day suspension, reset his point total to eight and a half, and awarded Jenkins back pay.  Both parties filed lawsuits in federal court—the company to vacate the award under the Labor Management Relations Act, the union to enforce it.  29 U.S.C. § 185(c).  The district court vacated the award on the ground that the arbitrator misread the agreement and exceeded his authority in doing so.

## II.

Our review of arbitration awards is deferential, especially so when it comes to challenges to the merits of an arbitrator's interpretation of the agreement.  *Mich. Family Res., Inc. v. Serv. Emps. Int'l Union Local 517M*, 475 F.3d 746, 750–52 (6th Cir. 2007) (en banc).  The focus tends toward a fair process, not substance, unless the substance of the interpretation is so off the wall that it makes implausible the idea that the arbitrator was engaged in interpretation in the first place.  We generally leave the parties to what they bargained for—an arbitrator's decision, not a court of appeals' decision—unless the arbitrator (1) committed fraud or other dishonesty, (2) resolved a dispute the parties did not submit to him, or (3) did not arguably interpret and apply the collective bargaining agreement.  *Id.* at 751–52.  Neither one of the first two possibilities exists here.  That means that, "[a]s long as the arbitrator is even arguably construing

or applying the contract," we will uphold the decision. *United Paperworkers Int'l Union, AFL-CIO v. Misco, Inc.*, 484 U.S. 29, 38 (1987).

What violates this arguable-construction standard? An interpretation "so untethered" from the terms of the contract that it conveys a lack of "good-faith interpretation." *Mich. Family Res.*, 475 F.3d at 753–54 (quotation omitted). Even that will be the rare case, *id.* at 753, as arbitrators may make "improvident, even silly" decisions without justifying a reversal, *id.* at 752 (quotation omitted). We tolerate these decisions in spite of their errors because, for better or worse, the parties "bargained for an arbitrator's interpretation of the contract, not a federal judge's." *Econ. Linen & Towel Serv., Inc. v. Int'l Bhd. of Teamsters, Teamsters Local Union 637*, 917 F.3d 512, 513 (6th Cir. 2019).

Today's decision clears this modest hurdle. As a matter of process, the twenty-four-page opinion bears all the "hallmarks of interpretation." *Mich. Family Res.*, 475 F.3d at 754. The arbitrator explained the background to the parties' dispute and cited the relevant provisions of the agreement and the attendance policy. He explained how each party interpreted the agreement and proceeded to analyze the various provisions. He then evaluated how the agreement applied to this situation. Through it all, he seemed to be engaged in "a good-faith interpretation of the contract." *Id.*

Although the arbitrator's merits analysis has some eyesores, it does not defeat the conclusion that he arguably construed the contract. At stake is how the just-cause provision relates to the provision that twelve points is "cause for termination." R.1-2 at 53. As the company sees it, reaching twelve points and "just cause" are one and the same. Once the employee crosses that threshold, says the company, that becomes just cause to fire him, no matter the circumstances. As the union sees it, the just-cause provision imposes a reasonableness requirement on the company. Even after an employee reaches twelve points, the company must justify a discharge decision. That's especially so in cases like this one, where the employee has worked at least twenty years with the company and where the policy as a result permits the company to impose a thirty-day suspension in lieu of a discharge. Each position has a plausible feel to it. Our task is not to choose the best interpretation. Else, why have an arbitration clause?

Why ask an arbitrator to decide a question as an alternative to litigation if a court can review that decision on the merits to identify the best answer?

Violating the policy, the arbitrator reasoned, creates "prima facie proof" for termination. R.1-3 at 17. But the agreement's just-cause provision requires more than a "mechanical application." *Id.* at 16. The company must consider the circumstances and, based on a consideration of the aggravating and mitigating factors, conclude that it had a reasonable basis to terminate the employee. Right or wrong, that's not an implausible interpretation of the contract or of "just cause." *Titan Tire Corp. of Bryan v. United Steelworkers of Am., Local 890L*, 656 F.3d 368, 374 (6th Cir. 2011).

As for the arbitrator's decision that the company lacked just cause to terminate Jenkins, that's plausible too. Yes, Jenkins committed a crime worthy of a thirty-day sentence and already had missed several days of work that year. But no one disputes Jenkins' explanation that the crime arose from a misunderstanding that got out of hand, he had worked for the company for twenty-two years, and the company had discretion to suspend him rather than fire him. We might have weighed these considerations differently had we been asked to resolve the dispute in the first instance. But the arbitrator's choice does not enter the prohibited land of imposing "his own brand of industrial justice." *Mich. Family Res.*, 475 F.3d at 754 (quotation omitted).

In truth, other rulings by the arbitrator—that could have resolved the case in Jenkins' favor—went against the union. The arbitrator rejected two outcome-dispositive grounds raised by the union: that the agreement required the company to provide Jenkins a thirty-day leave or allowed him to switch his vacation days.

A comparison between this case and cases that required us to vacate an arbitration award supports this conclusion. In *Totes Isotoner Corp.*, we vacated the award because the arbitrator relied on a *different agreement* from the one that governed the parties' dispute. *Totes Isotoner Corp. v. Int'l Chem. Workers Union Council/UFCW Local 664C*, 532 F.3d 405, 415–16 (6th Cir. 2008). And in *Peterbilt Motors*, the arbitrator tried to require a company to pay healthcare benefits after an insurer, not bound by the collective bargaining agreement, denied an employee

coverage based on its own eligibility requirements. *Peterbilt Motors Co. v. UAW Int'l Union*, 219 F. App'x 434, 436–38 (6th Cir. 2007).

Today's case by contrast falls into the large camp of cases—some for unions, some for companies—that uphold arbitration decisions rooted in the collective bargaining agreement. *See, e.g.*, *Titan Tire*, 656 F.3d at 374; *Royal Ice Cream Co. v. Teamsters Local No. 336*, 506 F. App'x 455, 457–58 (6th Cir. 2012); *MGM Grand Detroit, LLC v. Int'l Union, United Auto., Aero. & Agric. Implement Workers of Am.*, 495 F. App'x 646, 649–51 (6th Cir. 2012); *Earle v. Netjets Aviation Inc.*, 262 F. App'x 698, 701–02 (6th Cir. 2008) (per curiam).

The company insists that this arbitration decision is so head snapping that it deserves reversal. But the cases invoked by the company do not back it up. Save for the ones already mentioned, the cited cases use the wrong standard of review and predate our en banc decision in *Michigan Family Resources*. *See, e.g.*, *Int'l Bhd. of Firemen & Oilers, AFL-CIO Local No.935-B v. Nestle Co.*, 630 F.2d 474, 477 (6th Cir. 1980).

The company claims that the arbitrator never should have relied on Jenkins' testimony about his felony—and what led to the fight—after it objected to it during the hearing. But nothing in the agreement shows that the parties agreed to a set of procedures the arbitrator violated. The parties "bargained for arbitration to settle disputes and were free to set the procedural rules for arbitrators to follow if they chose." *Misco*, 484 U.S. at 39. The company never included any set of fact-finding procedures for the arbitrator to follow. Nor did any unfairness result anyway. The company had ample opportunities to question Jenkins about the incident and to present evidence undermining his accounts. It opted not to do so.

The company separately criticizes four features of the arbitrator's analysis that in its view leave the protected land of interpretation and enter the forbidden territory of unvarnished policymaking. How, the company asks, could someone interpret the attendance policy, which says reaching twelve points "is cause for termination," to mean anything else? R.1-2 at 53. But when parties sign multiple agreements, it's possible that one document—here the collective bargaining agreement—will control over another. *See Titan Tire*, 656 F.3d at 374. That this

arbitrator interpreted the collective bargaining agreement to govern the attendance policy is not a reversible error; it's just a plausible, if debatable, interpretation. *Id.*

Errors two and three train their sights on a similar target: that the arbitrator's award imposed new requirements on the company nowhere found in the collective bargaining agreement. The company thinks the arbitrator erred when he faulted the company for not investigating the circumstances of Jenkins' felony and for not considering a thirty-day suspension instead of a termination. But these arguments overlook the context in which the arbitrator reached these conclusions. He merely explained what "just cause" entailed. To the arbitrator, it meant investigating the circumstances that caused Jenkins to cross the twelve-point threshold and considering a suspension instead of a discharge. We have said before that arbitrators who interpret "just cause" to require reasonable punishment or some kind of process prior to discharge do not necessarily commit a reversible error. *See Titan Tire*, 656 F.3d at 374; *MGM Grand Detroit*, 495 F. App'x at 650; *Royal Ice Cream*, 506 F. App'x at 457.

A company wary of that option may clarify that "just cause" does not permit it. Had the company clarified two features of this agreement, we do not see how the arbitrator could have plausibly contradicted them. The company might have spelled out any authority to suspend an employee with more than twenty years of service for thirty days was a purely discretionary decision left solely to the company's judgment. And it might have spelled out in the words of the agreement that the company has sole discretion to discharge anyone who reaches twelve points under the attendance policy without regard to fault and without regard to any other considerations. Had the agreement said as much, it's difficult to see how a court could uphold such a text-defying arbitration decision.

Error four, the most serious of the quartet, concerns the arbitrator's references to the "substantive due process guarantee integral in the contractual just cause provision." R.1-3 at 22. It was precisely this aspect of the arbitrator's decision that the district court could not overlook and, we must emphasize, bothers us too. Substantive due process is a constitutional doctrine used to determine the validity of public laws, not to determine the meaning of a private contract. It's enough that federal law permits judges to read free-flowing substantive limitations into a

procedural constitutional guarantee; why should we permit arbitrators to exacerbate the risk to fair decision making by reading unbounded considerations into the meaning of private contracts?

Think about the problem this way. Compare an arbitrator who flips a coin to decide who wins the case with an arbitrator who uses substantive due process to decide who wins the case. The arbitrator who uses the coin flip would not be engaged in interpretation, we can all agree, and a federal court would have to vacate such an arbitrary decision. But a compelling argument can be made that the arbitrator who uses substantive due process to decide who wins is the greater culprit when it comes to fair interpretation. At least the arbitrariness of the coin flip leads to neutral outcomes—decisions that do not run the risk of favoring companies or unions based on the policy predilections of the arbitrator. The same cannot be said of substantive due process. Ask yourself how often federal and state judges have used substantive due process over time to innovate new constitutional rights with which they disagreed. If history often runs in one direction on this score, that suggests the arbitrator who uses substantive due process represents a greater risk to fair interpretation than the referee who flips a coin.

All of this explains why we, like the district court judge, cannot blithely dismiss a mistake of this sort to the kind of silly-but-permissible errors federal courts must tolerate. To the contrary, an arbitrator who uses substantive due process to interpret private contracts might just as well invoke the prohibited "brand of industrial justice," an equally impermissible ground for decision.

Even so, we do not think this decision must be vacated. For one, the reference to substantive due process was collateral to the arbitrator's reasoning. For another, it's not clear what the arbitrator meant. Was this a slip of the tongue or a peek under the veil? In context, the arbitrator seemed to be referring to process-driven considerations, something arbitrators have fairly considered before. The offending sentence occurs in the context of the requirement that "the Company make a full, fair[,] and informed determination of whether exercise of its discretion to impose a 30-day suspension in lieu of termination was justified." *Id.* Our decisions have acknowledged the similarities between fair procedural considerations and just cause considerations. *MGM Grand Detroit*, 495 F. App'x at 649–50. All in all, while this decision

clears the modest bar for reviewing the merits of an arbitrator's interpretation of a contract, we must acknowledge that the arbitrator scraped it several times.

One last point. Although Zeon's objections fail to persuade us, we do not think its decision to litigate this case remotely warrants attorney's fees. Fee awards are appropriate in "egregious cases of misconduct." *Jones v. Cont'l Corp.*, 789 F.2d 1225, 1232 (6th Cir. 1986). Local 72D offers no good explanation why Zeon's conduct rises to that level.

We reverse the district court's judgment and remand the case to reinstate the arbitrator's award.