NOT RECOMMENDED FOR PUBLICATION
File Name: 22a0106n.06

No. 20-4073

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

|  |  |  |
|---|---|---|
| BROWNING-FERRIS INDUSTRIES OF OHIO, INC., d/b/a Republic Services of Elyria, | ) ) ) ) | **FILED**<br>Mar 08, 2022<br>DEBORAH S. HUNT, Clerk |
| *Plaintiff-Appellee,* | ) ) |  |
| v. | ) ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF OHIO |
| INTERNATIONAL BROTHERHOOD OF TEAMSTERS, LOCAL UNION NO. 20, | ) ) ) |  |
| *Defendant-Appellant.* | ) ) |  |

Before: BOGGS, THAPAR, and BUSH, Circuit Judges.

BOGGS, J., delivered the opinion of the court in which THAPAR and BUSH, JJ., joined. THAPAR, J. (pp. 18–20), delivered a separate concurring opinion.

BOGGS, Circuit Judge. The amount that waste-collection companies pay drivers for each house on a collection route is often set by a collective bargaining agreement ("CBA") that requires disputes to be resolved by arbitration. In this case, the International Brotherhood of Teamsters, Local Union No. 20 (the "Union"), went to arbitration with Browning-Ferris Industries of Ohio, Inc., d/b/a Republic Services of Elyria ("Browning-Ferris"), because it believed that the company's payment rates to drivers in Lorain, Ohio violated the parties' CBA. An arbitrator agreed with the Union, reasoning that after Browning-Ferris significantly reorganized the Lorain routes and technology, the higher rates it paid to drivers in neighboring communities would be the rates paid in Lorain. The company challenged the award, and the district court vacated it.

But courts must uphold a labor arbitration award as long as the arbitrator was "arguably construing or applying the contract." *Mich. Fam. Res., Inc. v. Serv. Emps. Int'l Union Loc. 517M*, 475 F.3d 746, 752 (6th Cir. 2007) (en banc) (quoting *United Paperworkers Int'l Union, AFL-CIO v. Misco, Inc.* 484 U.S. 29, 38 (1987)). We conclude that the award clears this modest hurdle. Accordingly, we reverse the district court. We also decline to instruct the district court to remand to the arbitrator for clarification of the award.

## I

## A

Browning-Ferris provides waste-collection and recycling services for several communities west of Cleveland. It operates most of its residential routes under contracts with municipal governments. The Union represents the company's drivers pursuant to a CBA.

The CBA in effect during this case was negotiated in January and February 2017. Article 7 of that document addresses procedures for employee grievances. An employee first registers a grievance with the company. If the parties do not resolve their dispute, either side may choose to bring it before a state labor-management committee. After that committee issues a decision, either party may seek arbitration.

Three additional provisions are particularly relevant here. First, Article 3 contains an illustrative list of the "management rights" reserved by Browning-Ferris "[e]xcept as specifically modified by the express terms of this Agreement." R. 15-3, PageID 320. For example, the company retains the rights "to determine or introduce new, [sic] eliminate or change equipment, machinery, services, or processes[;] to make studies of workloads and to institute changes in the work loads [sic] and job assignments; [and] to plan, direct and control operations." *Ibid.* Second, Section 10.07

requires the company to post a collection route for bidding if the route changes by "more than twenty (20%) percent with regard to house counts." *Id.* at PageID 331.

Finally, Article 9 governs employee wages. Section 9.01 lists the hourly wages to be paid to various classes of workers. Section 9.02 provides that for most categories of drivers, Browning-Ferris must pay the greater of the designated hourly rate or the "piece work rate." *Id.* at PageID 327. The piece-work rate, also known as the incentive rate, is a payment an employee earns per house on a route. Though the CBA does not provide a specific methodology regarding how to determine this rate, Section 9.04 states:

> The Company agrees to guarantee piece work rates for the term of this Agreement as long as service requirements remain the same, such requirements including, but not limited to, the location of disposal sites, volumes generated per units and equipment utilized to perform the service. A mere increase in house count shall not establish a change in service requirements, thereby justifying a reduction in the piece work rate. The Union reserves the right to grieve the adjusted rate.

*Ibid.* Section 9.13 adds that "[n]othing contained in this Agreement shall prevent the payment of a higher rate of pay at the discretion of [Browning-Ferris] and no employee shall inadvertently have his rate reduced as a result of this Agreement." *Id.* at PageID 329.

Section 9.04 has remained substantially the same for over a decade. During the negotiations for the 2017 version of the CBA, however, Browning-Ferris attempted and failed to change Section 9.04. It first proposed deleting the provision altogether. When the Union rejected this option, Browning-Ferris proposed adding language that would allow the company to change piece-work rates for certain municipal contracts and open bids. The Union also refused to accept this proposal, and the language remained unchanged in the 2017 CBA.

**B**

Browning-Ferris provided waste-collection and recycling services for Lorain residents pursuant to a contract with the city in effect from December 31, 2013 through December 30, 2018.

In accordance with its terms, Browning-Ferris conducted unlimited collection services, and drivers arrived on scheduled days to manually collect curbside items throughout their routes. The company was not required to provide containers to hold waste or recyclable material.

With the end of the guaranteed term for the Lorain contract and the threat of competitors winning the contract looming, Browning-Ferris decided to switch from a manual collection system to an automated alternative. In an automated collection, a driver operates a joystick to control a mechanical arm that deposits the contents of a waste container into a truck, instead of exiting the vehicle to carry and toss the waste. Browning-Ferris had experience overseeing similar changes, having moved to automated collection in several other municipalities in the Cleveland area before doing so in Lorain. Ultimately, this strategy helped Browning-Ferris negotiate a three-year extension to its contract with Lorain.

The transition to automated collection took place in May 2017. Browning-Ferris invested over $4 million in acquiring new trucks, retrofitting old trucks, and purchasing approximately twenty thousand ninety-six-gallon waste containers and twenty thousand sixty-four-gallon recycling containers to distribute to residents. The new receptacles limited waste disposal but encouraged recycling, and, consequently, the average household waste volume decreased while recycling volume increased. The automated technology also made collection more efficient, although the evidence before the arbitrator was conflicting on the amount of the increase in house counts on collection routes that was enabled by the new system.[1]

---

[1] T.J. Rose, the company's operations manager, testified at the arbitration hearings that in his experience, the transition to automated waste collection generally allowed drivers to reach "at least 30 percent" more homes on each route. *See* R. 15-1, PageID 140. Mark Schmiehausen, a union official, testified that the transition could increase house counts by approximately sixty-seven percent (i.e., from 900 to 1,500 houses per route). R. 15-2, PageID 227. David Kidder, another Browning-Ferris manager, testified at various points that house counts could double, increase by thirty to forty percent, or increase by sixty-seven percent. *Id.* at PageID 256. And in its post-hearing brief in the arbitration, Browning-Ferris reported that "the average amount of homes collected per day in Lorain for waste increased from

Browning-Ferris then adjusted its routes. Previously, under the manual collection system, it had conducted seven waste routes and one recycling route in Lorain; under the new automated system, it conducted four waste routes, three recycling routes, four monthly bulk-waste routes, and two seasonal yard-waste routes. Because this action altered the routes by more than twenty percent with respect to house counts, Section 10.07 of the CBA required the company to post the routes for bidding.

When the employees saw the new routes, they noticed that Browning-Ferris was changing the offered piece-work rates. During the era of manual collection, drivers received $0.3704 per house for waste routes and $0.0811 per house for recycling routes. After the switch to automated collection, drivers would receive $0.2207 per house for waste routes and $0.1700 per house for recycling routes. These rates were less than the piece-work rates that Browning-Ferris gave to drivers in other municipalities. Automated waste routes in those locations were $0.2307 per house (one cent greater than the Lorain rate), and automated recycling routes were $0.2174 per house ($0.0474 greater).

Though these discrepancies might appear small, the Union argued that they were significant. During the arbitration proceedings, for example, it pointed to a waste-collection route where a driver would earn $2,859.48 less per year and a recycling route where a driver would earn $17,837.76 less under the Lorain rates than they would under the rates applied in nearby communities.

---

approximately 661 homes per day using manual collection to approximately 1,113 homes per day using automated collection," an increase of approximately sixty-eight percent. R. 15-24, PageID 604 n.8.

**C**

The Union brought a grievance on behalf of Thomas Coultrip and seven other Browning-Ferris employees regarding the new piece-work rates. Coultrip asserted that due to his new automated route, his effective rate of pay had decreased. Browning-Ferris and the Union were unable to reach agreement, so the company appealed to the Ohio Joint State Committee, which unanimously upheld the Union's claim, albeit in a single-sentence opinion. The company then submitted the matter to arbitration pursuant to Article 7, and the parties attended two hearings before an arbitrator.

On May 22, 2019, the arbitrator issued a decision sustaining the Union's grievance and finding that Browning-Ferris had violated Section 9.04. By way of remedy, he ordered the parties to meet, both to adjust drivers' piece-work rates retrospectively and to adjust the rates "on a prospective basis" so that they were "consistent with other comparable jurisdictions of the Company and the Union or any other approach acceptable to the parties." R. 15-26, PageID 654.

Browning-Ferris then brought an action to vacate the arbitration award and deny the Union's grievance. The Union answered and filed a counterclaim seeking enforcement of the award. Both parties moved for summary judgment. The district court, exercising jurisdiction pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 185, granted the company's request to vacate the arbitration award and denied the Union's motion, reasoning that the arbitrator had failed to arguably construe or apply the CBA.

The Union timely appealed. We now exercise jurisdiction under 28 U.S.C. § 1291.

**II**

We review a district court's grant of summary judgment in a labor arbitration dispute de novo. *Totes Isotoner Corp. v. Int'l Chem. Workers Union Council/UFCW Loc. 664C*, 532 F.3d 405,

410 (6th Cir. 2008). "Summary judgment is appropriate if the evidence, when viewed in the light most favorable to the nonmoving party, shows that there is no genuine issue of material fact such that the moving party is entitled to judgment as a matter of law." *Ibid.* In reviewing a district court's decision to vacate an arbitrator's award, "the focus is on the arbitrator's analysis, not that of the district court." *Truck Drivers Loc. No. 164 v. Allied Waste Sys., Inc.*, 512 F.3d 211, 216 (6th Cir. 2008).

Our analysis of an arbitrator's decision is highly deferential. Courts are foreclosed from reevaluating the merits of an award; that is, "[a]s long as the arbitrator's award 'draws its essence from the collective bargaining agreement,' and is not merely 'his own brand of industrial justice,' the award is legitimate." *Misco*, 484 U.S. at 36 (quoting *United Steelworkers of Am. v. Enter. Wheel & Car Corp.*, 363 U.S. 593, 597 (1960)). We will not discard an award "unless the arbitrator (1) committed fraud or other dishonesty, (2) resolved a dispute the parties did not submit to him, or (3) did not arguably interpret and apply the collective bargaining agreement." *Zeon Chems., L.P. v. United Food & Com. Workers, Loc. 72D*, 949 F.3d 980, 982 (6th Cir. 2020) (citing *Mich. Fam. Res.*, 475 F.3d at 751–52).

**A**

This case concerns only whether the arbitrator was "arguably construing or applying the contract." *Mich. Fam. Res.*, 475 F.3d at 753.[2] To determine whether the arbitrator arguably construed a labor contract, we ask whether the arbitrator was "engaged in interpretation," rather than whether the arbitrator's interpretation was correct. *Ibid.*

---

[2] Neither party claims that the arbitrator committed fraud or acted dishonestly, and the district court rejected the company's argument that the arbitrator acted outside his authority by resolving a dispute that the parties had not committed to arbitration. Browning-Ferris does not challenge that holding.

Two considerations guide us. First, we analyze the "form" of the arbitrator's actions, an inquiry that "focus[es] on whether the arbitrator was engaged in the act of interpretation." *Bhd. of Locomotive Eng'rs & Trainmen*, 700 F.3d at 905. Thus, where an arbitrator's opinion contains some indicia that the arbitrator was interpreting the contract, it satisfies our review. *See Mich. Fam. Res.*, 475 F.3d at 754. The arbitrator's opinion must not contain any indication "that he was doing anything other than trying to reach a good-faith interpretation of the contract." *Ibid.*; *see also Zeon Chems.*, 949 F.3d at 985 (stating that both an arbitrator's award based on a coin flip and an award resting on substantive due process would fail to engage in contract interpretation and would therefore be vacated under this standard). To aid us in this analysis, we look for "hallmarks of interpretation," such as whether the arbitrator cited to relevant contract provisions, analyzed those provisions, identified the parties' positions on the proper reading, or adopted one of those positions. *See Econ. Linen & Towel Serv., Inc. v. Int'l Bhd. of Teamsters, Teamsters Loc. Union 637*, 917 F.3d 512, 514 (6th Cir. 2019).

Second, we turn to the "substance" of the opinion to the extent that it sheds light on whether the arbitrator was arguably construing the contract. *Bhd. of Locomotive Eng'rs & Trainmen*, 700 F.3d at 905. If the arbitrator's decision on the merits is "so untethered from the [collective bargaining] agreement that it casts doubt on whether he was engaged in interpretation, as opposed to the implementation of his 'own brand of industrial justice,'" then it sets forth an implausible interpretation of the CBA, and the arbitrator likely has failed to arguably construe the contract. *Mich. Fam. Res.*, 475 F.3d at 754. In other words, we can only throw out the decision if it is rubbish. This consideration is not an invitation to find fault with the substance of the arbitrator's decision or the quality of the arbitrator's reasoning; rather, substance is only relevant when it "is so off the wall that it makes implausible the idea that the arbitrator was engaged in interpretation in the first

place." *Zeon Chems.*, 949 F.3d at 982. Because the parties agreed to use arbitration to resolve disputes over their contract's substance, "[o]ur task is not to choose the best interpretation. Else, why have an arbitration clause?" *Id.* at 983.

Both of these considerations indicate that the arbitrator here arguably construed the CBA. The district court concluded otherwise, so reversal is warranted.

**1**

The arbitrator's decision presents indicia that he was trying to interpret the contract and no indication that he was trying to do anything other than that. *Mich. Fam. Res.*, 475 F.3d at 754. To begin with, the arbitrator sets out the applicable contract provisions and the parties' competing interpretations of the CBA. *See Econ. Linen & Towel Serv.*, 917 F.3d at 514. He then quotes the relevant provisions of the CBA, such as Section 9.04 and Article 3. And he recognizes the Union's argument that Section 9.04 guarantees minimum piece-work rates at the same level as in nearby communities, as well as Browning-Ferris's response that the provision entitled the company to change piece-work rates *without constraint* when there was a change in "service requirements" and that the transition to automated collection qualified as such a change. Ultimately, he adopts the Union's view. *See ibid.* These features share many characteristics with decisions where this court has upheld arbitration awards. *See, e.g.*, *Zeon Chems.*, 949 F.3d at 983.

In his analysis, the arbitrator commences by observing that the parties' dispute centered on "whether the evidence establishes a potential violation by [Browning-Ferris] of the parties' negotiated Agreement," and that his role as the arbitrator was to "interpret and apply [the CBA] provisions." R. 15-26, PageID 648. He then turns to the negotiation history, observing that Browning-Ferris failed to amend or eliminate Section 9.04, and that the parties knew that when the company had transitioned to automated collection in nearby municipalities, it had paid a piece-

work rate of $0.2307 for waste collection. Because of this negotiation history and the parties' knowledge of regional practices, the Union "reasonably assumed" that the piece-work rate that Browning-Ferris used in nearby communities for the same work with the same equipment would be applicable for the Lorain employees when they shifted to automated collection. *Id.* at PageID 651–52. Browning-Ferris's decision to establish a lower piece-work rate, the arbitrator concludes, violated both the agreement and the company's duty to bargain in good faith.[3]

The arbitrator's decision satisfies our deferential review. It is well established that a decision need not be vacated if an arbitrator considered extrinsic evidence as part of a good-faith attempt to interpret a contract. *See, e.g.*, *Bhd. of Locomotive Eng'rs & Trainmen*, 700 F.3d at 905; *Titan Tire Corp. of Bryan v. United Steel Workers of Am., Loc. 980L*, 656 F.3d 368, 374–75 (6th Cir. 2011). And the decision here evinces such a good-faith interpretative attempt. The arbitrator repeatedly references Section 9.04, noting its "import" and "language," and he concludes that Browning-Ferris failed to establish that its claim of unfettered ability to decrease piece-work rates "was a *recognized component* [of the new CBA] resulting from the parties' negotiations." R. 15-26, PageID 649–51 (emphasis added). True, the decision did not state that the language of Section 9.04 was so ambiguous as to justify an inquiry into bargaining history and community practices, but we do not require arbitrators to utter magic words from contract-law hornbooks. Rather, it is at least arguable—if not probable—that the arbitrator referenced this extrinsic evidence to inform his reading of the "import" of Section 9.04. That is enough for our inquiry into the form of the decision. *See Mich. Fam. Res.*, 475 F.3d at 753–54.

---

[3] The arbitrator also indicated that he would give "deference" to the decision of the Ohio Joint State Committee, the entity (which had equal representation of labor and management) that had considered the dispute before the arbitration and had unanimously decided in favor of the Union. The arbitrator explained that "[t]he members of that committee are likely very familiar with the dynamics of the trash disposal business and the workings and significance of incentive rates paid for such work." R. 15-26, PageID 652.

Here, there are at least two interpretations of Section 9.04: Either Browning-Ferris can reduce the piece-work rate without limitation as soon as service requirements change, or its discretion is limited by factors such as the old rates or the rates in nearby communities. The arbitrator did not expressly state whether he found Section 9.04 to be ambiguous, and so there is an argument that his consideration of extrinsic evidence in the absence of such a finding was a poorly reasoned approach. Yet our review of the arbitrator's decision looks to whether he was arguably construing or applying the contract, and not to the quality of his reasoning or whether his interpretation was the best one. *See Zeon Chems.*, 949 F.3d at 983. After all, "[a]rbitrators have no obligation to the court to give their reasons for an award," and if courts were to require error-free decisions, arbitrators might be encouraged to give fewer reasons rather than better ones. *Enter. Wheel & Car*, 363 U.S. at 598. Therefore, as we have previously observed, "in most cases, it will suffice to enforce the award that the arbitrator *appeared to be engaged in interpretation*, and if there is doubt we will presume that the arbitrator was doing just that." *Mich. Fam. Res.*, 475 F.3d at 753 (emphasis added). In other words, we can infer that the arbitrator found an ambiguity in Section 9.04 before moving onto extrinsic evidence, as he presents some indicia that he was interpreting the contract and gives no indication that he was trying to do anything other than that. *See id.* at 754.

## 2

We also look to the substance of the arbitrator's decision insofar as it shows whether he was arguably interpreting the CBA. *See Mich. Fam. Res.*, 475 F.3d at 753. The district court held in part that the decision should be vacated because it was an "implausible reading of the CBA," R. 24, PageID 780, and Browning-Ferris urges us to adopt its reasoning. In the company's view, Section 9.04 unambiguously permits it to adjust piece-work rates without constraint during the

transition to automated collection, because (1) that section does not establish minimum piece-work rates or indicate how to calculate them beyond stating that "[t]he Company agrees to guarantee piece work rates . . . as long as service requirements remain the same"; (2) the "service requirements" changed during the transition from manual to automated collection; and (3) Article 3 of the CBA provides that the company retains "all rights of management" unless expressly modified. *See* R. 15-3, PageID 320, 327.

This may be the better reading of the contractual language. The CBA indicates what falls within the category of "service requirements" through an illustrative list rather than by definition: They include "the location of disposal sites, volumes generated per units [sic] and equipment utilized to perform the service," and exclude "[a] mere increase in house count." *Id.* at PageID 327. Because transitioning to an automated system results in different "volumes generated" per unit (due to new receptacles) and "equipment" (due to new and retrofitted trucks), it could follow that "service requirements" changed during the transition to automated collection. The district court agreed with this view, reasoning that "[i]t seems clear that service requirements changed when collection in Lorain transitioned from manual to automated." R. 24, PageID 780.

But the *best* reading is not the *only* reading available. The outlines of the arbitrator's reasoning—although admittedly blurry—allow us to discern the following interpretation. Recall that Section 9.04 permits Browning-Ferris to adjust piece-work rates because of new equipment or per-unit volumes, but it remains ambiguous as to whether there are any limits on the new rate the company can impose. The provision states only that Browning-Ferris "agrees to guarantee piece work rates . . . as long as service requirements remain the same." R. 15-3, PageID 327. It does not specify if the company is given carte blanche to change piece-work rates to any level once service requirements change. Given this contractual silence, the extrinsic evidence regarding the

parties' negotiating history permits the inference that the parties understood Section 9.04 to require rates resulting in pay in the range of that prevailing before the change, perhaps the rates given to drivers doing similar work in nearby communities after a similar change. *See, e.g.*, *Titan Tire Corp.*, 656 F.3d at 375–76. The arbitrator's opinion plausibly maps onto this interpretation of the CBA.

Viewing Section 9.04 in the context of the rest of the contract's text bolsters this reading. For example, Article 3 states that Browning-Ferris retained "all rights of management," including the authority to "institute changes in the work loads and job assignments," but does not expressly discuss compensation matters. R. 15-3, PageID 320. The company's authority on compensation might be excluded by implication. *Cf. Hucul Advert., LLC v. Charter Twp. of Gaines*, 748 F.3d 273, 281 (6th Cir. 2014) (discussing *expressio unius est exclusio alterius* maxim). Moreover, reading Article 3 to give Browning-Ferris complete discretion over pay rates might conflict with Section 9.01 and 9.02's guarantee of specified minimum hourly rates and requirement that employees be paid at the greater of that hourly rate or the piece-work rate. Therefore, the arbitrator could have concluded that Browning-Ferris did not retain full control over its piece-work rate, and thus that its transition to automated collection did not entail a boundless authority to change the rate. Again, such a reading would not necessarily have been substantively correct, but it would have involved a plausible interpretation of the CBA. And if an arbitrator makes "a serious legal error, but an error of interpretation nonetheless, [that error] does not authorize us to vacate the award." *Mich. Fam. Res.*, 475 F.3d at 756.

Several of the decisions cited by Browning-Ferris are distinguishable. They concern situations where an arbitrator made an interpretation of a CBA that was "off the wall" in contravention of its clear language, and so did not arguably construe the contract. *Zeon Chems.*,

949 F.3d at 982. In *International Union, United Automobile, Aerospace & Agricultural Implement Workers of America (UAW) v. TRW Automotive U.S. LLC*, 766 F. App'x 186 (6th Cir. 2019), an arbitrator stated that the language of a CBA was unambiguous, and then relied on the parties' behavior after the agreement to impose an award that contradicted its terms. *Id.* at 195–96. In *Dematic Corp. v. International Union, United Automobile, Aerospace & Agricultural Implement Workers of America (UAW)*, 635 F. Supp. 2d 662 (W.D. Mich. 2009), an arbitrator disregarded clear language in a CBA that imposed a three-month limit to insurance coverage after a voluntary layoff. *Id.* at 674. And in *Liberty Nursing Center of Willard, Inc. v. United Food & Commercial Workers Union Local 911*, 525 F. Supp. 2d 933 (N.D. Ohio 2007), an arbitrator refused to apply a contractual term that stated the price the employer would charge for dental and vision insurance, based on the employer's later practice of applying a lower rate. *Id.* at 935, 937. None of these cases concern a situation where the arbitrator's decision is consistent with a textually grounded finding that a contractual provision is ambiguous, and the arbitrator subsequently considers extrinsic evidence.

In sum, we disagree with the district court's view that the arbitrator's decision is "untethered" to the CBA; rather, the decision sets forth a plausible interpretation, it contains some indicia that the arbitrator was trying to interpret the contract, and it contains no indication that the arbitrator was trying to do anything other than that. We conclude that the arbitrator was arguably construing or applying the contract. *Mich. Fam. Res.* at 754. We accordingly reverse the grant of summary judgment to Browning-Ferris.

**B**

Browning-Ferris argues that if we reverse the district court, we should then remand to the district court with instructions to remand to the arbitrator for clarification, because the award is

ambiguous. The district court also agreed that the award was unclear. But a remand for clarification is not appropriate in this case.

Just as this court defers to an arbitrator's decision on the merits, so too does it defer to an arbitrator's chosen remedy. *See Misco*, 484 U.S. at 28 (explaining that "where it is contemplated that the arbitrator will determine remedies for contract violations that he finds, courts have no authority to disagree with his honest judgment in that respect"). However, when an arbitration award is ambiguous, a court may remand to the arbitrator for clarification. *M & C Corp. v. Erwin Behr GmbH & Co., KG*, 326 F.3d 772, 782 (6th Cir. 2003).

Here, the award has two principal components. First, the arbitrator directed the parties to meet "to first correct and pay the driver incentive rate retroactively back to the filing date of the grievance." R. 15-26, PageID 654. Second, he ordered Browning-Ferris "on a prospective basis" to "reengineer the automated waste incentive rates and route bids . . . that makes drivers whole consistent with the requirements of Article 9, Section 9.04, which may include automated driver waste and recyclable incentive rates consistent with other comparable nearby jurisdictions of the Company and the Union or any other approach acceptable to the parties." *Ibid.*

The retrospective component of the award is not ambiguous. It amounts to an instruction that Browning-Ferris pay the difference between the lower, original piece-work rate for automated routes and a new piece-work rate commensurate with the rates in nearby municipalities. Although the arbitrator did not specify the exact rate that the company must use, the opinion is sufficiently clear that he expected the company to use the same rates as in other communities in the region. The district court apparently did not view the first part of the award as ambiguous, either, as its discussion does not address the retrospective component of the award.

The purported ambiguity in the prospective part of the award relates to its instruction to the parties to meet and "reengineer" the piece-work rates and route bids. *Ibid.* It is true, as the district court said, that calling on parties to renegotiate an unspecified rate "leave[s] much to be desired" in terms of clarity. R. 24, PageID 782. However, "if the arbitrator's opinion and award, read together, are not ambiguous, the award should be enforced." *M & C Corp. v. Erwin Behr GmbH & Co., KG*, 143 F.3d 1033, 1038 (6th Cir. 1998). In context, the prospective component of the award instructs the parties to (1) set rates "consistent with other comparable nearby jurisdictions" going forward (as the arbitrator concluded was required by Section 9.04), unless they agree otherwise, and (2) restart the route bidding process in accordance with these new rates, if necessary, as under the arbitrator's ruling, some rates are relatively more lucrative than they were before.

Browning-Ferris argues that the open-ended nature of this award further demonstrates that the arbitrator was directing the parties to renegotiate the CBA, rather than arguably construing the contract. In some circumstances, an award directing parties to renegotiate might "ignore the plain language of the contract." *AP Parts Co. v. Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am.*, 923 F.2d 488, 491–92 (6th Cir. 1991) (quoting *Misco*, 484 U.S. at 38). But that is not what happened here, as illustrated by *Kroger Co. v. United Food & Commercial Workers Union Local 876*, 284 F. App'x 233 (6th Cir. 2008). In that post-*Michigan Family Resources* decision, we upheld an arbitrator's approach where he first interpreted the collective bargaining agreement to require compensation for employees' uniform-maintenance expenses, and then instructed the parties to confer regarding the amount of compensation under his interpretation, as they were in a better position to know the maintenance expenses. *Id.* at 240–42.

This case presents a similar situation, and *Kroger* is persuasive. The arbitrator arguably interpreted the CBA when he determined that the contract required Browning-Ferris to pay piece-work rates commensurate with those in nearby communities. Then, he told the parties to confer to set compensation in accordance with that interpretation. That remedy was not a command to renegotiate a CBA term upon which the parties had already agreed, but rather an instruction to implement his interpretation of Section 9.04. *See Kroger*, 284 F. App'x at 240 (distinguishing *AP Parts* because the arbitrator "did not require any renegotiation of a CBA term"). Therefore, we will not instruct the district court to remand to the arbitrator for clarification.

### III

For the foregoing reasons, we reverse the district court's grant of summary judgment to Browning-Ferris. We remand for proceedings consistent with this opinion.

THAPAR, Circuit Judge, concurring. In the labor-arbitration context, the Supreme Court has warned time and again: Federal courts have "no business weighing the merits of the grievance, considering whether there is equity in a particular claim, or determining whether there is particular language in the written instrument which will support the claim." *United Paperworkers Int'l Union, AFL-CIO v. Misco, Inc.*, 484 U.S. 29, 37 (1987) (quoting *United Steelworkers of Am. v. Am. Mfg. Co.*, 363 U.S. 564, 568 (1960)); *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 650 (1986) (quoting the same); *see also Major League Baseball Players Ass'n v. Garvey*, 532 U.S. 504, 509 (2001) (per curiam); *United Steelworkers of Am. v. Enter. Wheel & Car Corp.*, 363 U.S. 593, 598–99 (1960). Whether this unrelenting deference makes sense is not for us to decide. We are bound by the Court's directives.

But our circuit has strayed from these directives. It frames the analysis as whether "the arbitrator's construction is plausible." *Bhd. of Locomotive Eng'rs & Trainmen v. United Transp. Union*, 700 F.3d 891, 901–02 (6th Cir. 2012). And the majority faithfully applies this precedent. Yet the relevant question is not whether the arbitrator's interpretation is "plausible"; it's whether the arbitrator was "even arguably construing" the contract. *See Misco*, 484 U.S. at 38.

The difference between these inquiries is subtle but decided: The former weighs the merits of the grievance whereas the latter focuses on the arbitrator's intent. To avoid improperly weighing the merits, we must ask instead whether there is any indication the arbitrator was doing "anything other than trying to reach a good-faith interpretation of the contract." *Mich. Fam. Res., Inc. v. Serv. Emps. Int'l Union Local 517M*, 475 F.3d 746, 754 (6th Cir. 2007) (en banc). Framed this way, the inquiry respects the Supreme Court's warning not to consider whether specific terms in the contract support the claim. *See Misco*, 484 U.S. at 38.

Of course, the merits of the dispute (including the plausibility of the arbitrator's interpretation) play a role—albeit limited—in our analysis. *See Mich. Fam. Res.*, 475 F.3d at 753–54. For an arbitrator can't "ignore the plain language of the contract." *Misco*, 484 U.S. at 38. But the Supreme Court has made clear the focus is not on the arbitrator's interpretation. Rather, the focus is on "affirmative misconduct." *Id.* at 40. In other words, the implausibility of an arbitrator's interpretation may be evidence that the arbitrator intended to "dispens[e] his own brand of industrial justice." *Garvey*, 532 U.S. at 509 (quoting *Enter. Wheel & Car Corp.*, 363 U.S. at 597). But plausibility (or implausibility) is not the sole touchstone. Plausibility is relevant only to the extent it informs our understanding of the arbitrator's intent. Without other indicators of wrongful intent, it is unlikely to rise to the level of "affirmative misconduct" needed to vacate an award. *Misco*, 484 U.S. at 40.

Our circuit overlooks these nuances. Rather than using plausibility as a tool to get at intent, our precedent asks us to view the contract through our own interpretive lens and weigh the merits of the dispute—albeit with a thumb on the scale for the arbitrator. *See, e.g.*, *Bhd. of Locomotive Eng'rs & Trainmen*, 700 F.3d at 905. The problem with this approach is that it allows judges to insert their own, subjective views of whether the arbitrator's interpretation was plausible. And an arbitrator is not bound by the same considerations that courts are, particularly in the labor context. *See United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 581 (1960) ("The labor arbitrator performs functions which are not normal to courts; the considerations which help him fashion judgments may indeed be foreign to the competence of courts.").

In this way, our circuit's plausibility analysis reaches beyond the bounds of permissible review outlined by the Supreme Court. *See Garvey*, 532 U.S. at 509. While the majority deems the arbitrator's interpretation plausible, it just as easily could have come out the other way.

That's especially true in a case like this, where the arbitrator's reasoning is hard—if not impossible—to discern. *See* Maj. Op. 12 (describing the "outlines" of the arbitrator's reasoning as "admittedly blurry"). In this way, the validity of arbitration decisions may be vulnerable to the interpretive whims of judges. And that is a result the Supreme Court would assuredly admonish.

But here, the outcome is the same under both inquiries. That's because the arbitrator's decision does not indicate that he was doing anything besides "trying to reach a good-faith interpretation of the contract." *Mich. Fam. Res.*, 475 F.3d at 754. Nor is the arbitrator's award ambiguous. Thus, I concur.